

2007 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-19-2007

# Albrecht v. Horn

Precedential or Non-Precedential: Precedential

Docket No. 04-9005

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2007

Recommended Citation

"Albrecht v. Horn" (2007). *2007 Decisions.* Paper 1158.
http://digitalcommons.law.villanova.edu/thirdcircuit_2007/1158

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2007 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

**PRECEDENTIAL**

UNITED STATES COURT OF APPEAL
FOR THE THIRD CIRCUIT

———

Nos. 04-9005 and 04-9006

———

ALFRED ALBRECHT, SR.,

Appellant in No. 04-9006

v.

MARTIN HORN, Commissioner,
Pennsylvania Department of Corrections,

Appellant in No. 04-9005

———

On Appeal from the United States District Court
for the Eastern District of Pennsylvania
(D.C. Civil No. 99-cv-01479)
District Judge: Hon. Bruce W. Kauffman

———

Argued June 29, 2006

Decided November 21, 2006

Petition for Panel Rehearing Granted and Opinion Vacated April 10, 2007

Submitted April 11, 2007
after Granting Panel Rehearing

BEFORE: SLOVITER, AMBRO and COWEN, Circuit Judges.

(Filed April 19, 2007)

Stuart B. Lev, Esq. (Argued)
Defender Association of Philadelphia
Federal Capital Habeas Corpus Unit
The Curtis Center, Suite 545 West
Independence Square West
Philadelphia, PA 19106

     Counsel for Alfred Albrecht, Sr.

Michelle A. Henry, Esq.
David W. Zellis, Esq.
Stephen B. Harris, Esq. (Argued)
Colin D. Dougherty, Esq.
Office of the District Attorney
55 East Court Street
Bucks County Courthouse
Doylestown, PA 18901

     Counsel for Martin Horn, Commissioner,
     Pennsylvania Department of Corrections

_____

OPINION

_____

COWEN, Circuit Judge.

Alfred Albrecht, Sr. was found guilty by a Bucks County, Pennsylvania, Court of Common Pleas jury of first degree murder, two counts of second degree murder, and arson for causing the death of his wife, his mother, and his daughter by setting the family home on fire on the morning of May 1, 1979. He was sentenced to death for the murder of his wife. He also received two life sentences for the second degree murder convictions for the deaths of his mother and daughter, and a sentence of ten to twenty years imprisonment for arson, each sentence to run consecutively to the other and the sentence of death.

In an order entered on April 21, 2004, the District Court granted a writ of habeas corpus and vacated the death sentence pursuant to Mills v. Maryland, 486 U.S. 367 (1988), because of an ambiguous jury instruction concerning whether mitigating circumstances had to be found unanimously. The District Court, applying Third Circuit

2

precedent at that time, determined that <u>Mills</u> could be applied retroactively because it did not announce a new rule of constitutional law, <u>Banks v. Horn</u>, 316 F.3d 228 (3d Cir. 2003) (addressing <u>Teague v. Lane</u>, 489 U.S. 288 (1989)).  Although we agree that a <u>Mills</u> violation occurred in Albrecht's case, subsequent to the District Court's granting the writ our decision in <u>Banks</u> was reversed by the United States Supreme Court in <u>Beard v. Banks</u>, 542 U.S. 406 (2004), which held that <u>Mills</u> announced a new rule of constitutional law that would not apply retroactively to any case, such as this one, that became final prior to <u>Mills</u>.

The Commonwealth did not argue the nonretroactivity defense in the District Court, but we hold that the defense was properly raised for the first time in the brief on appeal, with specific reliance upon <u>Beard v. Banks</u>, and thus it is not waived.  Because the District Court did not have the benefit of the Supreme Court's 2004 <u>Beard</u> decision when it granted the writ on the basis of <u>Mills</u>, we will not reverse; instead, we will vacate the order granting the writ, and the matter will be remanded.  On remand, the District Court should apply <u>Teague's</u> ban on retroactive application of new rules of constitutional law and deny relief on the <u>Mills</u> claim.  The Court should consider the remaining sentencing-phase issues, which it initially denied as moot.  The District Court's determination that the guilt-phase issues do not warrant habeas relief will be affirmed.

## I. Background & Procedural History

On May 1, 1979, a neighbor saw smoke coming from the Albrecht home and called the fire department.  When one of the firemen responding to the fire entered the burning structure he discovered the charred remains of Carolyn Albrecht, appellant's wife, Anita Albrecht, his seven-year-old daughter, and Marian Albrecht, his elderly mother.  All three died as a result of the fire.  Albrecht was arrested in January 1980 after the arson investigation was completed.

The Commonwealth sought to prove that the fire was arson, and that the identity of the arsonist could be inferred from the violence and hostility Albrecht had directed toward Mrs. Albrecht in the months before the fire.  The trial court permitted the Commonwealth to introduce evidence that, in the seven months prior to the fire, Mrs. Albrecht had been physically abused by Albrecht, and that Albrecht was having an extramarital affair.  Some of the abuse testimony was dramatic, such as testimony that Mrs. Albrecht had been burned about the head with a cigarette and had bald spots on her scalp where her hair had been yanked out.

We summarize that evidence here.  Patricia Fullmer, a friend of Mrs. Albrecht's, testified that Albrecht ridiculed Mrs. Albrecht about her weight, and he admitted he had a

girlfriend, Linda Bethman.  Fullmer saw Mrs. Albrecht with her hair torn out and burn marks on her face.  Fullmer testified:

> She had a bruise on her chest about the size of a saucer, and she was kicked in the legs and she had bruises on her calf and he had banged her head against the refrigerator, and she said her head was numb so she didn't feel it when he burned her face with a cigarette.

Supp. App. 1990.  Mrs. Albrecht's co-workers, Sara Joraskie and Bonita Waitl, also testified to seeing first-hand Mrs. Albrecht's battered appearance in the months before the fire.

Attorney Marc Steinberg represented Mrs. Albrecht and filed a Protection from Abuse Petition in the Court of Common Pleas of Bucks County.  The state court issued a restraining order barring Albrecht from the house and directing him to refrain from abusing his wife for one year.  On February 7, 1979, Steinberg again saw his client, and she complained that Albrecht had beaten her the night before.  Steinberg testified that Mrs. Albrecht had black and blue marks on both her arms, a black eye, and bare spots on her scalp where her hair had been pulled out.

Carol and Terry Kuhns, neighbors, testified that, one day in January 1979, Mrs. Albrecht went to their home asking to be hidden in their basement because she was nervous and afraid.  She told them she was not wearing her dentures because she was afraid Albrecht would hit her so hard she would swallow them.  Carol Kuhns noticed black and blue marks on her face, neck, and legs, burn marks on her face, and bare spots on her scalp where hair had been pulled out of her head.  Later that evening, Albrecht came over to the Kuhns' residence and demanded to be told the whereabouts of his wife.  The Kuhns would not oblige by giving him that information.  On February 1, 1979, Mrs. Albrecht again went to the Kuhns' residence; Terry Kuhns observed that she was battered and bruised, and had "blotches" of hair missing.

Valerie Cullingford, a bartender at Herb and Joyce's Park Tavern, where Albrecht drank, testified that, in December 1978, she observed Albrecht kissing and holding hands with a woman named Linda.  Cullingford overheard Albrecht ask the woman to leave with him so he could "make a little love to her."  Supp. App. 2032–33.  Cullingford further testified that, the night before the fire, Albrecht came into the bar and drank five or six beers at a rate that seemed faster than usual.  He complained about how he was having problems with his wife, and said that if she tried to remove him from the house again "he would sooner burn the god damn thing down."  Supp. App. 2036–38.

4

George Weaver, a neighbor, testified that one day in January 1979 he overheard Albrecht talking in the Whitehorse Bar and referring to his wife as "that dumb bitch. I'm going to get her." Supp. App. 1637. Approximately seven months after the fire, Weaver again saw Albrecht at the Whitehorse Bar and overheard him say he was "glad it's over" and that he was "glad they're gone and that the house was burned." Supp. App. 1638–39.

Larry Wimmer, a friend of Albrecht's, testified that Albrecht complained to him in April 1979, in Herb and Joyce's Park Tavern, that he was being forced to move out of his house because he had hit his wife, and that he would kill her if he could not get back into it. Within a month of the fire, Albrecht told Wimmer that "he had a good lawyer, he would get away with it, [and] nobody would prove it." Supp. App. 1975.

A few days prior to the fire, John Wheeler, an employee at Herb and Joyce's Park Tavern, observed Mrs. Albrecht with a bruise around her eye and heard Albrecht state he would rather burn down his house than let his wife have it. Prior to this conversation, Albrecht told Wheeler that if his wife gave him any trouble he would take care of her. Donald Weaver, one of Albrecht's neighbors, testified that, while at the Whitehorse Bar and two or three days before the fire, he heard Albrecht say he was going to go home and "shoot the old lady and burn the house down." Supp. App. 1578. Paul Serocki testified that, a few days before the fire and while at the Whitehorse Bar, he overheard Albrecht say he was going to burn down his house.

On the evening prior to the fire, Perkasie Borough police officer Barry Heckenswiler was summoned to the Albrechts' home in response to a call by Albrecht's fifteen-year-old son, Alfred Jr. Upon his arrival, Officer Heckenswiler smelled alcohol on Albrecht's breath and noticed his elderly mother sweeping up glass from a broken lamp. Mrs. Albrecht told Officer Heckenswiler that she and Albrecht had argued, that Albrecht had threatened to burn her dress, and that she wanted to go to a hospital or local psychiatric facility. Subsequently, the situation calmed and Officer Heckenswiler left.

The next morning all but Albrecht and his son were dead from a fire. Alfred Jr. escaped the fire by jumping out of a second story window. As described by the state Supreme Court, "soon after the firemen had the blaze under control, the Fire Marshall [sic] and state police roped off the property for investigation purposes. Included in the roped-off area was a driveway in which a car was parked approximately fifteen feet from the house with the keys in the ignition. This vehicle, along with another vehicle parked in the roped-off area, were later found to be registered" to Albrecht. Commw. v. Albrecht, 511 A.2d 764, 768 (Pa. 1986).

On May 2, 1979, the morning after the fire, Albrecht "allow[ed] investigators to

5

search his premises for the purpose of determining the cause of the fire." Id. Later that day, Alfred Jr. "was questioned by the State Fire Marshall [sic] regarding the whereabouts of any gas cans on the premises." Id. Alfred Jr. showed the Marshal a can located in the garage that "obviously had not been used in some time." Id. The Marshal then asked Alfred Jr. "if he knew of any other gas cans," to which Alfred Jr. "replied, 'There's a hydraulic oil can in the trunk of my father's car.'" Id. At the Marshal's request, Alfred Jr. "removed the keys from the ignition and opened the trunk where the can was located." Id. This can, which usually held hydraulic oil for Albrecht's paving machine, had soot on it, and tested positive for gasoline. Importantly, a local gas station employee testified at the trial about Albrecht's attempt to purchase gasoline to put in a can the day before the fire.

To further prove that the fire was arson, the Commonwealth presented the testimony of the Fire Marshal and fire expert, Trooper William York. York testified that the fire started in the kitchen, and that it was started by igniting gasoline that had been poured on the floor. He believed this to be true

> [b]ecause of the char patterns on the walls, the char patterns on the floor, the char patterns on the doorway between the kitchen and the livingroom [sic] . . . , the low burning . . . at the various locations in the room . . . , the terrific damage to the refrigerator, the meltdown of the inside of the refrigerator, the char on the underside of the table and the char on the underside of the chairs.

Supp. App. 843–45.

The defense presented the testimony of fire expert, Professor Paul Kacznarczik, whose theory was that the fire started in the living room accidentally as a result of a cigarette left to smolder in an upholstered chair for a lengthy period. Kacznarczik explained that the living room was "preheated for a considerable length of time. There was a lot of unburned gases in there from the pyrolyzed solid furniture such that when the air came in [from the front door being opened], these gases being above their auto-ignition temperature, they just exploded . . . ." Supp. App. 2761. He described the fire as a "flash over type of a fire." Supp. App. 2763.

Kacznarczik disputed Trooper York's conclusion about the use of a liquid accelerant, testifying that:

> Well, as I said before, there was not a very big fire in the house. There was a lot of damage but it's relatively a small fire considering what could have

6

happened. If gasoline were used, they would have lost the house. That's my opinion. If the fire had started in the kitchen, that fire load being all wood and it was [a] really roaring ongoing fire, they wouldn't have been able to blanket it down that quickly plus the fact that the chimney effect over by the stairway, that fire would have definitely been up to the second floor with that drafting up the stairway. The fire was not really that much of a rolling fire in the kitchen.

Supp. App. 2763–64.

Alfred Jr. testified on behalf of his father that he heard a slat fall from his father's bed upstairs and thus believed that his father got out of bed after the fire started. However, his testimony also helped to establish the damaging fact that the can found in Albrecht's trunk immediately after the fire, which tested positive for gasoline, was normally used for hydraulic oil, and only a week before the fire, it had no gasoline in it. This contradicted Albrecht's testimony that gasoline had been in the hydraulic oil can (instead of hydraulic oil) for a month before the fire. Alfred Jr. also testified that, the day before the fire, his father hit his mother and threatened to burn her dress, and he found it necessary to summon the police.

Albrecht testified, and although he denied setting the fire, and denied trying to purchase gasoline the day before the fire, he admitted that he "smacked" Mrs. Albrecht in the face and "pulled some of her hair" when asked by the prosecutor if he was responsible for his wife's February 1979 injuries. Supp. App. 2558–60.

The jury convicted Albrecht on all counts after a trial that lasted nearly three weeks. A capital sentencing proceeding was conducted immediately following the verdict. The Commonwealth rested on its trial evidence at sentencing, while Albrecht presented the testimony of a psychiatric expert, Dr. Robert Sadoff. The jury found that the sole aggravating factor, Albrecht knowingly created a grave risk of death to another person in addition to the victim during the commission of the offense, 42 Pa. Cons. Stat. Ann. § 9711(d)(7), outweighed the mitigating factors established to the jury's satisfaction, which were three: no significant history of prior criminal convictions, 42 Pa. Cons. Stat. Ann. § 9711(e)(1), extreme mental or emotional disturbance, (e)(2), and "good worker," (e)(8) (catchall).

On direct appeal, the state Supreme Court affirmed the judgment of sentence. Albrecht, 511 A.2d 764. Albrecht's petition for writ of certiorari to the United States Supreme Court was denied on March 30, 1987. Albrecht filed a petition under the state post-conviction relief act, 42 Pa. Cons. Stat. Ann. §§ 9541–9546 (West 1998 and Supp.

7

2005), in the Bucks County Court of Common Pleas, which the trial court denied. The state Supreme Court affirmed. Commw. v. Albrecht, 720 A.2d 693 (Pa. 1998).

Albrecht filed his petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 in United States District Court for the Eastern District of Pennsylvania in 1999, raising the Mills claim, an innocence claim, and numerous other sentencing and guilt-phase claims. The Commonwealth submitted an answer, and with respect to the Mills claim it did not assert a nonretroactivity defense. The District Court conducted an evidentiary hearing, primarily on the innocence claim, at which Richard L. Custer, a forensic fire protection engineer, testified. The District Court granted Albrecht's habeas petition on the basis of Mills and vacated the death sentence. Albrecht's guilt-phase claims, and a newly added claim pursuant to Brady v. Maryland, 373 U.S. 83 (1963), all were denied with prejudice.[1] Because the Court found that the Mills claim required that Albrecht's sentence be vacated, it did not reach the other sentencing claims, which were denied as moot.[2]

## II. Jurisdiction & Standard of Review

The District Court granted a certificate of appealability on the Mills issue and all claims it had denied with prejudice. The Commonwealth has appealed the Mills determination, and Albrecht has cross-appealed, limiting his appeal to the following seven guilt-phase grounds for relief: (1) he is actually innocent and the presentation of inaccurate fire science expert testimony at his trial violated due process; (2) the prosecutor failed to disclose, or failed to timely disclose, exculpatory witness statements in violation of Brady and/or trial counsel was ineffective for failing to make effective use of timely disclosed statements; (3) trial counsel was ineffective for failing to request a limiting instruction with respect to the evidence of spousal abuse, and the absence of such an instruction violated due process; (4) admission of Mrs. Albrecht's statements to her physician, her attorney, and two other women, concerning the source of her physical injuries, violated the Confrontation Clause, and trial counsel was ineffective for failing to object to admission of the Kuhns' recollection of Alfred Jr.'s statement; (5) appellate counsel was ineffective for failing to challenge the trial court's ban on attorney-client

---

[1] The District Court agreed to hear a claim pursuant to Brady, which was not included in the original petition. It arose, at least to some extent, as a result of witness statements disclosed for the first time during the federal habeas case.

[2] The other sentencing claims included, but were not limited to, the claim that counsel was ineffective at sentencing in presenting mitigating evidence of Albrecht's mental and physical impairments and his difficult life history.

consultation just prior to and during cross-examination; and (6) the cumulative prejudice from the many errors denied him his constitutional right to due process.[3] At oral argument, Albrecht's counsel confined his remarks to the most substantial and serious issues presented by this appeal: the Mills and innocence issues, and the claim that trial counsel was ineffective for failing to request a limiting instruction with respect to the evidence of spousal abuse.

We have appellate jurisdiction pursuant to 28 U.S.C. §§ 1291 and 2253(a). We conduct a plenary review of the District Court's legal conclusions and review its factual conclusions for clear error. Whitney v. Horn, 280 F.3d 240, 249 (3d Cir. 2002). Our review is also plenary as to the District Court's determinations regarding exhaustion and procedural default, and nonretroactivity.

## III. The Mills Claim

The District Court granted relief on Albrecht's claim that the sentencing instructions given to the jury were defective under Mills v. Maryland, 486 U.S. 367. The Court concluded that our opinion in Banks v. Horn, 271 F.3d 527 (3d Cir. 2001), rev'd on other grounds, 536 U.S. 266 (2002), compelled the conclusion that the instructions given in Albrecht's case were unconstitutionally ambiguous with respect to whether mitigating factors must be found unanimously. The District Court reasoned that the jury instruction at Albrecht's trial emphasized jury unanimity in close proximity to the mitigating circumstances clause. In addition, the instructions emphasized the difference between the relative burdens of proof for showing aggravating circumstances and mitigating circumstances, but did not mention any differences in the unanimity requirements. Identical language was used in the Banks case, in which we found that these two elements were likely to create confusion in a juror's mind.

The Commonwealth has appealed this decision. Because the Mills claim has unquestionable merit, we will discuss it in detail. Ultimately, however, and even though Albrecht can successfully overcome all of the other habeas procedural hurdles, we are obliged to sustain the Commonwealth's appeal because "Teague's nonretroactivity principle acts as a limitation," Banks v. Beard, 542 U.S. at 412, on our power to grant habeas corpus relief to a state prisoner such as Albrecht whose conviction became final before Mills was decided.

## 1. Exhaustion & Procedural Default

---

[3] These are the issues we will address. An issue that is not discussed in the briefs is waived. See Skretvedt v. E.I. DuPont De Nemours, 372 F.3d 193, 202–03 (3d Cir. 2004).

The Mills claim falls into a group of claims raised by Albrecht's initial state post-conviction counsel but abandoned by replacement post-conviction counsel prior to the trial court's decision denying post-conviction relief. The initial public defender appointed to the case filed an amended post-conviction petition, raising seventy-two claims of error. He withdrew, and replacement post-conviction counsel explicitly waived all but three issues, including the Mills issue. Albrecht, 720 A.2d at 698. On appeal to the state Supreme Court, new appellate post-conviction counsel, the Center for Legal Education, Advocacy and Defense Assistance, raised the Mills issue, and, anticipating a waiver problem, argued that replacement post-conviction counsel was ineffective for abandoning the claim at the trial court level.

The state Supreme Court would not consider the Mills claim on the merits, holding for the first time that Pennsylvania's "relaxed" waiver doctrine no longer applied in capital post-conviction appeals. Albrecht, 720 A.2d at 700. Finding that there were adequate safeguards to ensure the fairness of verdicts in capital cases, and that the relaxed waiver doctrine impeded the goal of finality of judgments, the Court held that: "Henceforth, a PCRA petitioner's waiver will only be excused upon a demonstration of ineffectiveness of counsel in waiving the issue." Id.

With respect to replacement post-conviction counsel's having abandoned the Mills claim, the state Supreme Court held that the relief available "to an appellant for a claim that PCRA counsel's judgment was exercised in a legally ineffective manner is an evaluation of the claims prior counsel has foregone for a determination of ineffectiveness." Id. at 701 (citing Commw. v. Travaglia, 661 A.2d 352, 367–68 (Pa. 1995)). The Court would grant relief only if Albrecht could show that "counsel's conduct, by action or omission, was of questionable legal soundness; that the conduct complained of had no reasonable basis designed to effectuate [his] client's interest; and that counsel's conduct had an adverse effect on the outcome of the proceedings." Id. (quoting Commw. v. Clark, 710 A.2d 31, 35 (Pa. 1998)). The Court did a prejudice analysis of the Mills issue, and concluded that replacement post-conviction counsel's conduct in abandoning it in the trial court did not constitute ineffective assistance. Id. at 706.

Thus, there was a state procedural default with respect to the Mills issue insofar as it was abandoned at the trial court level, O'Sullivan v. Boerckel, 526 U.S. 838, 844-45 (1999) (habeas petitioner must show that he fairly presented federal claim at each level of state court system), and the state Supreme Court held that it was waived. However, the claim is not barred due to a procedural default, Coleman v. Thompson, 501 U.S. 722, 752–54 (1991), because a defaulted claim may be reviewed in federal habeas upon a showing that the procedural rule applied was not "independent" and "adequate." See Harris v. Reed, 489 U.S. 255, 260–61 (1989).

A state rule provides an independent and adequate basis for precluding federal review of a claim if the "rule speaks in unmistakable terms[,] all state appellate courts refused to review the petitioner's claims on the merits[, and] the state courts' refusal [was] consistent with other decisions," that is, the procedural rule was "consistently and regularly applied." Doctor v. Walters, 96 F.3d 675, 683–84 (3d Cir. 1996). Whether the rule was firmly established and regularly applied is determined as of the date the default occurred, and not as of the date the state court relied on it, id. at 684, because a petitioner is entitled to notice of how to present a claim in state court, Ford v. Georgia, 498 U.S. 411, 423–24 (1991).

The waiver rule applied for the first time on November 23, 1998 in Commonwealth v. Albrecht, 720 A.2d 693, is not independent and adequate as to Albrecht. Harris, 489 U.S. at 260–61. Albrecht committed his default either when he failed to raise the Mills issue on direct appeal, or, at the latest, when replacement post-conviction counsel abandoned the issue, which occurred some time before the post-conviction petition was denied on January 24, 1996. Albrecht, 720 F.3d at 698. Either way, the default occurred before the state Supreme Court held on November 23, 1998 in his case that the relaxed waiver doctrine no longer applied in capital post-conviction appeals.

At the time of Albrecht's direct appeal, and at the time replacement post-conviction counsel abandoned the Mills issue, the state Supreme Court was still applying the relaxed waiver rule. The "unforgiving" waiver rule was not "consistently and regularly applied" at the time of Albrecht's default. Doctor, 96 F.3d at 683–84. Cf. Bronshtein v. Horn, 404 F.3d 700, 708–09 (3d Cir. 2005), cert. denied, 126 S. Ct. 1320 (2006) (Pennsylvania post-conviction statute of limitations not firmly established nor regularly applied until November 23, 1998, at the earliest, when Commonwealth v. Albrecht, 720 A.2d 693 (1998), was decided).[4] Accordingly, neither the exhaustion nor procedural default doctrines bars consideration of the Mills claim.

2. Scope of review

---

[4] The District Court appears to have concluded that the Mills issue, Count XI in the habeas petition, was not in the group of claims subject to the above analysis. The court conducted the above analysis with respect to several other claims, and arrived at the same conclusion we have arrived at, but evidently did not believe that the Mills issue was one of the issues abandoned by replacement post-conviction counsel. We disagree with the District Court on this minor procedural point, see Albrecht, 720 A.2d at 706, which ultimately has no bearing on the outcome of the case.

11

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") prohibits federal habeas relief on any claim "adjudicated on the merits in state court proceedings," unless that adjudication resulted in a decision that was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1). However, the "unreasonable application" prong of section 2254(d)(1) permits a federal habeas court to grant the writ if the state court identifies the correct governing legal principle but unreasonably applies that principle to the facts of a petitioner's case, or if it unreasonably refuses to extend that principle to a new context where it should apply. Williams v. Taylor, 529 U.S. 362, 407–08 (2000); see also Bell v. Cone, 535 U.S. 685, 694 (2002). A federal habeas court may not issue the writ simply because it concludes in its independent judgment that the state court applied clearly established law incorrectly. Williams, 529 U.S. at 410. "Rather, that application must also be unreasonable." Id.

The state Supreme Court did not, of course, address the Mills issue on the merits in the ordinary sense; instead, it examined the merits in the context of the prejudice prong of an ineffective assistance of post-conviction counsel claim, Albrecht, 720 A.2d at 701 n.8. Albrecht does not argue that this issue may be reviewed de novo under these circumstances, nor would such an argument have merit. The state Supreme Court identified the correct governing legal principle, id. at 706, and then purported to apply it, which constitutes an adjudication on the merits sufficient for purposes of the statute. Cf. Priester v. Vaughn, 382 F.3d 394, 398 (3d Cir. 2004) (deference under AEDPA does not even require citation to Supreme Court cases), cert. denied, 543 U.S. 1093 (2005). We turn then to whether the state courts unreasonably applied Mills.

### 3. The Mills Standard & Merits Analysis

In addition to establishing that Albrecht had no significant criminal history and was a worker of good character, the defense established through the testimony of a psychiatrist that Albrecht was under extreme mental or emotional disturbance at the time of the offense. In Mills v. Maryland, 486 U.S. 367, the Supreme Court vacated a death sentence after concluding that there was a "substantial probability that reasonable jurors, upon receiving the judge's instructions in this case, and in attempting to complete the verdict form as instructed, well may have thought they were precluded from considering any mitigating evidence unless all 12 jurors agreed on the existence of a particular such circumstance." Id. at 384. The Court held that the Constitution prohibits states from requiring jurors to find mitigating factors unanimously. See McKoy v. North Carolina, 494 U.S. 433, 444 (1990); Mills, 486 U.S. at 374–75.

Two years later, the Supreme Court decided Boyde v. California, 494 U.S. 370

12

(1990), and established a test for reviewing an ambiguous jury instruction.  Id. at 380. "[A] petitioner's Mills claim alleging juror confusion as to unanimity must be examined under Boyde to determine whether there is a reasonable likelihood (as opposed to merely a possibility) that jurors have applied the challenged instruction in a way that prevents the consideration of constitutionally relevant mitigating evidence."  Hackett v. Price, 381 F.3d 281, 291 (3d Cir. 2004), cert. denied, 544 U.S. 1062 (2005).

We examined instructions in Frey v. Fulcomer, 132 F.3d 916, 923–24 (3d Cir. 1997), a pre-AEDPA case, and Banks, 271 F.3d at 547–48, an AEDPA case, and found Mills violations in both.  Without question, Frey and Banks compel a conclusion that the instructions given in Albrecht's case were constitutionally infirm.[5]  A side-by-side comparison of the Frey, Banks, and Albrecht instructions shows that they are virtually identical, as follows:

---

[5] Our decision in Banks, 271 F.3d 527, to grant relief under Mills is no longer precedential on the Teague issue given the Supreme Court's holding in Beard, 542 U.S. 406.  Nevertheless, our discussion regarding the Mills issue is "instructive and relevant to our current inquiry," Hackett, 381 F.3d at 294 n.9.

| *Banks Instructions* | *Albrecht Instructions* |
|---|---|
| Members of the jury, you must now decide whether the defendant in this case is to be sentenced to death or to life imprisonment on each of the Informations upon which you have returned a verdict of guilty of murder in the first degree. The sentence you will impose will depend on your findings concerning aggravating and mitigating circumstances. The Crime Code in this Commonwealth provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances, or if the jury unanimously finds one or more aggravating circumstances which outweigh any mitigating circumstance or circumstances.<br>*** | Members of the jury, . . . it now becomes your duty to decide whether or not the sentence imposed upon the defendant . . . will be death or life imprisonment . . . . [Y]our sentence will depend upon your findings concerning aggravating and mitigating circumstances. The Crimes Code provides that the verdict must be a sentence of death if the jury unanimously finds at least one aggravating circumstance and no mitigating circumstances or if the jury unanimously finds [sic] more aggravating circumstances which outweigh any and all mitigating circumstances. In all other cases, the verdict must be a sentence of life imprisonment.<br>*** |
| Remember, under the law of this Commonwealth, your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstance, or if you unanimously find one or more aggravating circumstances which then outweigh any mitigating circumstances. In all other cases, your verdict would be life imprisonment.<br>*** | Remember that your verdict must be a sentence of death if you unanimously find at least one aggravating circumstance and no mitigating circumstances or if you unanimously find one or more aggravating circumstances, and there is only one in this case, one submitted to you which outweighs any and all mitigating circumstances. In all other cases, your verdict must be a sentence of life imprisonment.<br>*** |
| Once again, the Commonwealth has the burden of proving aggravating circumstances beyond a reasonable doubt. The defendant has the burden of proving mitigating circumstances by a preponderance of the evidence.<br><br>Banks, 271 F.3d at 546-47; see also Frey, 132 F.2d at 922-23 (similar). | Now, the burden of proving aggravating circumstances is upon the Commonwealth. The Commonwealth must convince you, beyond a reasonable doubt, that the aggravating circumstance exists in this case.<br><br>[T]he burden of proving mitigating circumstances is on the defendant . . . . The burden is by preponderance of the evidence.<br><br>Supp. App. 2990-92; 2995-98. |

Like the instructions in <u>Banks</u>, the instructions at Albrecht's trial emphasized the importance of unanimity. The phrase is used frequently and in much too close proximity to the mitigating circumstances clause. 271 F.2d at 549. Furthermore, the verdict slip is confusing. It stated in pertinent part:

1.   We, the jury, unanimously sentence the defendant to:
     <u>X</u>   death
     ____   life imprisonment

2.   (to be used if the sentence is death):
     We, the jury, <u>have found unanimously</u>

          *          *          *          *

_____   one aggravating circumstance which outweighs any and all mitigating circumstances. The aggravating circumstance is <u>*a Grave Risk Of Death To Another Person in Addition to Victim*</u>

_____   The mitigating circumstance(s) (is) (are)
          ① <u>*No Significant History, Prior Convictions*</u>
_____   ② <u>*Extreme Mental & Emotional Disturbance*</u>
_____   ③ <u>*Good Worker*</u>

Supp. App. 347 (emphasis added).

The verdict slip is virtually identical to the verdict slip in <u>Banks</u>, which we found confusing and more likely suggestive. The "lead-in language" regarding unanimity implies that everything that followed was found unanimously. 271 F.3d at 550. As in <u>Banks</u>, "[w]hat follows is a reference both to aggravating and to mitigating circumstances, with no additional language that would imply that there is a different standard for aggravating circumstances than there is for mitigating circumstances." <u>Id.</u> Nor was there any language anywhere else on the form "from which the jury could infer that a mitigating circumstance might be marked if only one juror had found that circumstance to exist." <u>Id.</u>

Moreover, this case is not like <u>Hackett</u>, 381 F.3d 281, where we concluded that there was no <u>Mills-Boyde</u> violation. <u>Id.</u> at 301–02. In <u>Hackett</u>, there was no reasonable likelihood that the jurors misunderstood their task. According to that jury verdict form, "the jury unanimously found no mitigating circumstance. Because the jury found no

15

mitigating circumstance, it did not proceed to determine whether any mitigating circumstance outweighed the aggravating circumstances it unanimously found, as did the juries in Zettlemoyer, [923 F.2d 284 (3d Cir. 1991)], Frey, and Banks." Id. at 303. In Albrecht's case, in contrast, the jury found three mitigating circumstances, and had to weigh them against one aggravating circumstance.

The Commonwealth has argued that we denied habeas relief to a capital defendant in Zettlemoyer on a similar instruction. We disagree that the instructions in Zettlemoyer are similar. The relevant portion of the jury charge in Albrecht's case emphasized the importance of a unanimous finding, using the phrase frequently and in close proximity to, that is, within six or seven words of (in several places), the mitigating circumstances clause. In Zettlemoyer, the separation was by seventeen words, and we found the Zettlemoyer instructions to require unanimity in the ultimate conclusion, and not in the interim findings leading to that conclusion. 923 F.2d at 308.

We thus conclude, as did the District Court, that the jurors in Albrecht's case well may have thought they were precluded from considering any mitigating evidence unless all twelve jurors agreed on the existence of a particular such circumstance. Mills, 486 U.S. at 384; see also Frey, 132 F.3d at 923-24, Banks, 271 F.3d at 547-48. Our conclusion that Mills was violated does not end the discussion, however, because this is an AEDPA case.

## 5. Deference Under AEDPA

The District Court determined that the state Supreme Court's determination of the Mills issue constituted an unreasonable application of that case. We agree with that conclusion. The State Supreme court decided the Mills issue, in its entirety, as follows:

> This court has instructed that the Pennsylvania capital sentencing statute, 42 Pa.C.S. § 9711, does not require unanimity as to any particular mitigating factor before it can be given effect in the sentencing determination and therefore does not unduly restrict the jury's decision as proscribed on Eighth Amendment grounds in Mills. The instruction given here substantially tracked the language of 42 Pa.C.S. § 9711(c)(1), and did not explicitly or implicitly require that each mitigating factor be unanimously agreed upon by the jury in order to be weighed against the aggravating circumstance found in this case. The verdict slip in this case . . . also did not violate the principles expressed in Mills. The slip clearly required unanimity upon only the existence of the sole aggravating factor advanced by the prosecution, the determination that this aggravating factor outweighed any

16

and all mitigating factors, and the sentence of death. The verdict slip does not express or imply a requirement that mitigating circumstances must be unanimously found to be considered and therefore did not violate the Eighth Amendment.

Albrecht, 720 A.2d at 706 (citations omitted).

This is an unreasonable application of Mills, because the Court ignored Mills' teachings and focused instead on the meaning of the state statute and whether it was subject to a reasonable construction, rather than on the issue of jury confusion. Banks, 271 F.3d at 544–45. As in Banks, the state court should have focused on whether the need for unanimity was a conclusion that a reasonable juror could have drawn from the instruction and verdict slip. Id. at 547. In Albrecht's case, our caselaw holds there is a reasonable likelihood that a reasonable juror could have assumed the existence of a unanimity requirement with respect to mitigating circumstances. Id. at 548–49. Moreover, the state Supreme Court's statement that the verdict slip clearly required unanimity only upon the existence of the sole aggravating factor advanced by the prosecution is objectively unreasonable and not just incorrect, Williams, 529 U.S. at 410. The verdict slip used in Albrecht's case is virtually identical to the confusing verdict slip disapproved of in Banks, 271 F.3d at 549–50.

Accordingly, this habeas procedural hurdle, section 2254(d)(1) of AEDPA, is also one that Albrecht can overcome. We come, however, to the end of the line.

### 6. Mills is New Law and the Teague Defense is Properly Before Us

The next issue we must consider is whether Teague's prohibition against the retroactive application of new rules of constitutional law should bar granting Albrecht's petition for a writ of habeas corpus. At the time that Albrecht filed his writ of habeas corpus, this Court had not yet considered whether Mills was retroactive. The Commonwealth did not raise Teague as a defense at the District Court level. While the writ of habeas corpus was pending before the District Court, this Court held in Banks v. Horn, 316 F.3d at 235, that Mills could be applied retroactively because Mills did not announce a new rule of constitutional law. The District Court then issued its decision and considered the Teague issue sua sponte, holding that Mills is retroactive pursuant to our decision in Banks II. After the District Court rendered its decision granting habeas relief on the Mills issue, the United States Supreme Court reversed our holding in Banks II and held in Beard v. Banks, 542 U.S. 406, that Mills announced a new rule of constitutional law that would not apply retroactively to any case that became final prior to the Mills decision. Albrecht's case became final prior to Mills.

17

In the present appeal, the Commonwealth raised a <u>Teague</u> defense in its opening brief before us, contending that <u>Mills</u> should not be applied retroactively pursuant to <u>Beard</u>. Albrecht argues that the Commonwealth waived the <u>Teague</u> defense at the District Court level, and <u>Beard</u> should not bar habeas relief.

A federal court has the discretion to raise the <u>Teague</u> issue sua sponte when the State fails to raise the defense. <u>See, e.g.</u>, <u>Caspari v. Bohlen</u>, 510 U.S. 383, 389 (1994) ("[A] federal court may, but need not, decline to apply <u>Teague</u> if the State does not argue it."); <u>Schiro v. Farley</u>, 510 U.S. 222, 229 (acknowledging that the Court "undoubtedly [had] the discretion to reach" a <u>Teague</u> defense not raised by the State below). The <u>Teague</u> defense promotes the interests of comity to state court adjudications and the finality of criminal judgments. <u>See</u> <u>Lewis v. Johnson</u>, 359 F.3d 646, 653 (3d Cir. 2004).

In the present case, we will allow the <u>Teague</u> defense even though the State failed to raise the defense with the District Court. The Commonwealth's failure to raise the <u>Teague</u> defense had absolutely no effect on how the District Court ruled in the matter, because the District Court considered the issue of <u>Teague</u> sua sponte (and noted that our decision in <u>Banks II</u> permitted the retroactive application of <u>Mills</u>). Because the District Court considered the <u>Teague</u> defense sua sponte, appellate review of the issue is appropriate. <u>See</u> <u>Wilkerson v. Whitley</u>, 28 F.3d 498, 504 (5th Cir. 1994) (electing to consider <u>Teague</u> defense even though the state failed to raise issue in its original brief before the panel because <u>Teague</u> was the primary reason given by the district court for its judgment). Moreover, the parties have fully briefed <u>Teague</u> as well as the issue of waiver in the briefs before us. There is no prejudice to either party in our consideration of <u>Teague</u>.

As noted above, the Supreme Court held in <u>Beard</u> that <u>Mills</u> is not retroactive. Because we are applying <u>Teague</u> in the present case, we must vacate the District Court's order granting relief pursuant to <u>Banks II</u>, and remand so the District Court can address Albrecht's other sentencing issues that were initially deemed moot.

## IV. The Innocence Claim

Albrecht argued in his habeas petition that new developments in fire science prove his claim of actual innocence. The District Court permitted Albrecht's habeas attorneys to present testimony at an evidentiary hearing from Richard Custer, a privately retained fire protection engineer. Custer testified that all of the observations relied on by Trooper York to support his conclusion that the fire was set in the kitchen using gasoline—for example, the burn patterns on the floor, the damage to the underside of the chairs and the table, the "V" patterns on the walls, the heavy damage to the refrigerator, and the

18

blistering of wood ("alligatoring")—are now understood to be equally consistent with an accidental fire that resulted in full room involvement.

The District Court concluded that Albrecht had convincingly shown that the fire science presented by the Commonwealth at his trial has since been discredited to the extent it provided an unreliable basis for the conclusion that a liquid accelerant had definitely been used and that the fire could only have been arson. However, the Court concluded that the new evidence was legally insufficient under Supreme Court precedent to prove that Albrecht was actually innocent, because Custer's testimony established only that the fire might have been accidental. There was sufficient other evidence that the fire was not accidental, including the hydraulic oil can found in Albrecht's car which tested positive for gasoline, the evidence that Albrecht repeatedly abused his wife, and the threats he made to Larry Wimmer, John Wheeler, Valerie Cullingford, and Carol Kuhns to harm his wife and burn down the house.

Albrecht has appealed the District Court's ruling on this guilt-phase issue, which raises substantial questions about whether it is cognizable in federal habeas, and, if it is, whether it was exhausted in the state courts. We address each threshold question in turn, but the ultimate claim is lacking in merit.

### 1. Cognizability

In Herrera v. Collins, 506 U.S. 390 (1993), the Supreme Court observed that a claim of innocence based on newly discovered evidence has never been a basis for federal habeas relief absent an independent constitutional violation occurring in the state trial. Id. at 398–99. See also Fielder v. Varner, 379 F.3d 113, 122 (3d Cir. 2004). In her concurrence, however, Justice O'Connor noted that

> [n]owhere does the Court state that the Constitution permits the execution of an actually innocent person. Instead, the Court assumes for the sake of argument that a truly persuasive demonstration of actual innocence would render any such execution unconstitutional and that federal habeas relief would be warranted if no state avenue were open to process the claim.

Herrera, 506 U.S. at 427 (O'Connor, J., concurring).

In this context, the Supreme Court two years later recognized a miscarriage-of-justice exception to the general rule that petitioners must prove actual innocence to avail

themselves of federal *habeas* if they forfeited state habeas claims on procedural grounds. Schlup v. Delo, 513 U.S. 298, 324 (1995). Where sustaining a verdict is fundamentally unjust, Schlup adopted a rule to implement the "miscarriage of justice" exception as follows: Petitioners asserting a miscarriage of justice need not point to new evidence that proves actual innocence as they must under Herrera; rather, as a "gateway" to defaulted claims, they must establish that, in light of new evidence (including "new exculpatory scientific evidence"), "it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt." Id. at 327.

The Supreme Court again revisited Justice O'Connor's Herrera concurrence recently in House v. Bell, 547 U.S. __, 126 S. Ct. 2064 (2006). In House, the Court reaffirmed that the Schlup standard applies to federal habeas petitions claiming actual innocence when the petitioner cannot show cause and prejudice for a defaulted claim. See also Sawyer v. Whitley, 505 U.S. 333 (1992). Justice Kennedy emphasized in House that the Schlup rule should ensure that a petitioner's case is truly "extraordinary." House, 126 S. Ct. at 2077 ("[I]t bears repeating that the Schlup standard is demanding and permits review only in the extraordinary case."). But he also noted that "[a]t the same time, though, the Schlup standard does not require absolute certainty about the petitioner's guilt or innocence." Id. Concluding that House's case met the standard under Schlup but not Herrera, House explained that

> the [Herrera] Court described the threshold for any
> hypothetical freestanding innocence claim as "extraordinarily
> high." [506 U.S. at 417]. Herrera requires more convincing
> proof of innocence than Schlup. It follows, given the
> closeness of the Schlup question here, that House's showing
> falls short of the threshold implied in Herrera.

Id. at 2087. Nevertheless, the Court concluded that "House has cast considerable doubt on his guilt—doubt sufficient to satisfy Schlup's gateway standard for obtaining federal review despite a state procedural default." Id.

Like the District Court, we are not persuaded by Albrecht's arguments that his claim may be cognizable under the ordinary Herrera standards that require actual innocence plus a constitutional violation.[6] Instead, we must decide whether Albrecht's

---

[6] Albrecht has argued that expert testimony based on unreliable science would have constitutional significance if it resulted in a fundamentally unfair trial. See Estelle v. McGuire, 502 U.S. 62, 68–70 (1991); Keller v. Larkins, 251 F.3d 408, 413 (3d Cir.

claims are cognizable in federal habeas under the "extraordinarily high" threshold implied in Herrera's freestanding innocence claim or, alternatively, the lower Schlup gateway standard. Before applying these analyses on the merits, we first must decide whether the claims are unexhausted such that a procedural default analysis is required.

## 2. Exhaustion and Procedural Default

"An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted unless it appears that – (A) the applicant has exhausted the remedies available in the courts of the State." 28 U.S.C. § 2254(b)(1)(A). Albrecht's federal habeas claim that he is actually innocent is now supported by the affidavit of a privately retained modern fire science expert. The claim was presented at both levels, trial court and state Supreme Court, during post-conviction proceedings, Albrecht, 720 A.2d at 706–08, but without this evidentiary support. Instead, in state court the claim was accompanied by a request for public funds to pay for an expert.

The District Court concluded that the federal habeas claim was different, but that Albrecht could show cause and prejudice for his failure to bring the "substantive" aspect of the claim in state court. The Court reasoned that, because Albrecht could not prove his case without expert testimony, and the state courts would not provide the funds for an expert, the state courts prevented him from substantiating his claim Moreover, Albrecht demonstrated that fire science actually had changed.

Whether the freestanding innocence claim is unexhausted, such that a procedural default analysis is required, presents a close question. A habeas petitioner must present a federal claim's factual and legal substance to the state courts. Bronshtein, 404 F.3d at 725

_____

2001). Moreover, a claim under the fundamental fairness standard would arise if the probative value of the evidence, although relevant, was greatly outweighed by the prejudice to the accused from its admission. Bisaccia v. New Jersey Atty Gen., 623 F.2d 307, 313 (3d Cir.1980). The problem for Albrecht in relying on such an argument is that Trooper York's fire science was reliable at the time of trial. Even his new expert, Custer, opined at the evidentiary hearing that he would have arrived at a similar conclusion in 1980 based on what was known at the time. We cannot conclude therefore that there was a constitutional violation at trial, and are left with the Supreme Court's admonition that federal habeas courts are not forums in which to relitigate state trials. Herrera, 506 U.S. at 400-01. As such, we must analyze the merits under the implied Herrera standards that recognize freestanding innocence claims or the Schlup/House standards that only require a petitioner to cast enough doubt on the evidence to call a conviction into question.

(citing <u>McCandless v. Vaughn</u>, 172 F.3d 255, 261 (3d Cir. 1999)).  However, the only difference between the state post-conviction version of the claim and the federal habeas version of the claim is the existence of evidentiary support in the form of an expert report and testimony.  The sum and substance of it was presented to the state court.

In his state petition, Albrecht contended that due process required the provision of public funds to establish his claim that after-discovered evidence had undermined the reliability of his conviction.  He "alleged that advances in fire investigation science, not widely known or available at the time of his trial, indicate[d] that certain burn patterns once considered a tell-tale sign of a fire started by means of a liquid accelerant are equally consistent with the effects of a 'flashover' fire of innocent origin."  <u>Albrecht</u>, 720 A.2d at 707.  Although Albrecht now has an expert, this is much the same claim he raised in his federal habeas petition.

The state supreme court analyzed whether Albrecht was entitled to public money for an expert under 42 Pa. Cons. Stat. Ann. § 9543(a)(2)(vi), the provision of the state post-conviction relief act dealing with claims of innocence based on after-discovered evidence, and also <u>Ake v. Oklahoma</u>, 470 U.S. 68 (1985), where the United States Supreme Court held that a defendant has a due process right to the assistance of experts necessary to prepare a defense.  <u>Albrecht</u>, 720 A.2d at 707.  The Court addressed the new science and considered whether or not the verdict was reliable in view of the new developments.

The Court explained:

> Appellant contends that the PCRA court abused its discretion because "[t]he fact that the <u>concept</u> of flashover had been discussed at trial merely underscores the importance of the post-trial scientific discovery that evidence once thought to be consistent only with a flammable liquid fire is now known to be indicative of a flashover fire."  <u>Initial Brief of Appellant</u>, at 35 (emphasis in original).  Appellant argues that new scientific knowledge could establish that the fire may have been started by a smoldering cigarette in a living room chair, as he contended at trial, and spread to the kitchen by means of a flashover.
>
> Here, Appellant presented no more than anecdotal support for his motion.  Nevertheless, we find Appellant's submissions sufficient to indicate that fire investigation science has made significant strides in the period subsequent to his trial.  Appellant has not demonstrated, however, that an expert in the field existed who was willing to assist in developing this claim of innocence

22

if funds became available.  More importantly, Appellant has not established by factual analysis or argument that the trial court's denial of funds prejudiced him.

Id. (footnote omitted).

The Court went on to explain the nature of "the flashover phenomenon," and to express its disbelief that the surrounding circumstances, and Albrecht's testimony about how he was able to get out of the house, could support that theory.  Id. at 707–08.  The Court concluded:

On the basis of the record presented in the PCRA court, Appellant has failed to establish that the court abused its discretion in denying his application for expert witness funds.  Due process principles did not require the PCRA court to provide public funds for expert assistance because nothing submitted by Appellant established that the scientific knowledge could have been exploited under the facts of this case.  See Ake v. Oklahoma, supra.  Accordingly, we find no abuse of discretion in the trial court's order denying Appellant's request.

Id. at 708 (footnote omitted).

Granted, the expert who testified at Albrecht's habeas hearing provided additional evidence (over and above Kacznarczik's trial testimony) in support of the asserted facts and legal theory of this claim, and, as a result, the theory of a smoldering chair and subsequent flashover was less speculative, Albrecht, 720 A.2d at 707 (observing that trial court denied request for funds due to speculative nature of claim), but only by a matter of degree.  Ultimately, the state post-conviction claim was not very different from the federal habeas claim.  The essential factual and legal substance of the innocence/unreliable fire science claim was presented at both the trial and state Supreme Court levels.  We thus conclude that the claim was fairly presented, Picard v. Connor, 404 U.S. 270, 275 (1971), and meets the requirements for exhaustion.  Thus, a procedural default analysis is unnecessary.[7]

_____

[7] In any event, prejudice is not shown by the mere fact that fire science has changed.  To overcome the procedural bar, if there is one, "[t]he habeas petitioner must show not merely that the errors at . . . trial created a possibility of prejudice, but that they worked to

23

3. The Merits of the Actual Innocence Claim

With respect to the merits, we agree with the District Court that Albrecht has not shown that he is actually innocent under Herrera[8] and add that he has also failed to meet the Schlup gateway standards. Custer testified that the fire could have been accidental in origin. He reasoned that, once hot gases produced by a fire reach the ceiling, they begin to move back down toward the floor. The heat then sets the floor on fire and causes damage to the full room, including at low levels. He further testified that "you can get complete destruction on floor covering materials from a nonincendiary fire." Supp. App. 3063. Thus, fire-scene evidence of an accidental fire that has reached full room involvement is indistinguishable from the evidence seen after an incendiary fire that likewise affected the full room.

When fairly read, however, Custer's opinion was that, although modern fire science could lead one to a different conclusion, he could not conclude one way or another; he left open the possibility that the fire was, as Trooper York concluded, intentionally set. In short, Custer simply could not rule out the possibility that the fire was incendiary in origin. Because he did not conclude that the fire was accidental, and because, as the District Court concluded, there was ample other evidence of guilt, Albrecht's new evidence falls short of showing that he is actually innocent under the Herrera standards.

Albrecht's new evidence also falls short of the Schlup gateway standard, as applied in House. House turned on DNA evidence that would have prevented reasonable jurors from placing significant reliance on the blood evidence presented against the defendant, House. Importantly, the case involved the existence of another suspect, the victim's husband, who had made incriminating statements about her murder and who had a history of abusing her. The prosecution's case was based in large part on what FBI testing showed—that semen consistent with House's was present on the victim's nightgown and panties, and that small bloodstains consistent with her blood, but not House's, appeared on the jeans belonging to House. House, 126 S.Ct. at 2072. This physical evidence linked

his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Murray v. Carrier, 477 U.S. 478, 494 (1986) (quoting United States v. Frady, 456 U.S. 152, 170 (1982)). This standard essentially requires the petitioner to show he was denied "fundamental fairness" at trial. Id. As the District Court ultimately concluded, this is not a showing that Albrecht can make.

[8] Because the state Supreme Court did not review the testimony of Richard Custer, no deference is owed under section 2254(d)(1).

House to the crime. The prosecution, when challenged that House had no motive, strongly suggested that the motive was rape. Id. at 2075.

In direct contradiction of the evidence presented at trial, new DNA testing established that the semen on the victim's nightgown and panties came from her husband, and not from House, id. at 2078–79; and new evidence showed that the bloodstains on House's pants could have come from carelessly spilled autopsy samples rather than directly from the victim as a result of a violent crime, id. at 2079–82. The Supreme Court believed this to be important because, "[f]rom beginning to end the case is about who committed the crime. When identity is in question, motive is key." Id. at 2079. The new DNA evidence effectively destroyed the theory of rape as the motive for the murder. Id. Without the blood evidence, House did not have a motive, but the victim's husband did. Id. at 2083–85.

In Albrecht's case, even if we assume that Trooper York's testimony has been discredited like the blood evidence in House, we must conclude that the new evidence raised questions about the alleged incendiary nature of the fire, while identity and motive (implicating Albrecht) were established by the other evidence. The substantial remainder of the Commonwealth's case has not been discredited and provides ample evidence of guilt. Specifically, Custer's testimony did nothing to undermine the Commonwealth's damaging evidence of Albrecht's pattern of hostility and violence directed toward Mrs. Albrecht, his attempt to purchase gasoline to put in a can the day before the fire, the immediate discovery of the empty hydraulic oil can in the trunk of his car that tested positive for gasoline, and his numerous threats to burn down the house and do further harm to his wife.[9]

Moreover, Custer's testimony did bear at least some similarity to the testimony of defense expert Kacznarczik, which was argued to the jury and rejected. Kacznarczik was emphatic that the fire did not involve the use of a liquid accelerant, that is, gasoline. He explained away the presence of petroleum distillates by noting that all "modern day buildings" contain plastic materials that are "effectively solid gasoline" or "petroleum distillates." Supp. App. 2737–38. Furthermore, in support of his conclusion that the fire did not start in the kitchen, he noted the "great structural damage," Supp. App. 2748, in the living room and, in particular, the smoldering chair and drywall near it which were completely destroyed. On cross-examination, Custer could not disagree that Kacznarczik's testimony was based on a theory that superheated gases in the living room were ignited by oxygen, just as his was.

---

[9] Albrecht's additional assertion that the Commonwealth's fire investigation was inadequate finds no support in the record.

25

Albrecht has argued on appeal that Trooper York repeatedly told the jury that the evidence provided unequivocal proof that the fire was started with the use of a liquid accelerant. This may indeed sum up Trooper York's testimony on direct, but it ignores the success defense counsel had on cross-examination. The defense featured an extensive cross-examination of Trooper York that lasted three days and covers 298 pages of the trial transcript. Trial counsel had some success in establishing facts that supported the defense theory that the fire started in the living room, in a chair where a cigarette was smoldering, and not in the kitchen. He established that the front door to the living room was burned through almost completely, the front porch was badly charred, items in the kitchen cabinets were unaffected by the intense heat of the fire, there were indeed intense flames in the living room, and York had no idea what the wind velocity was on the day of the fire despite his reliance on the wind as an explanation for the intensity of the fire in the living room.

In addition, we do not find persuasive Albrecht's "other evidence of innocence" argument that Alfred Jr.'s testimony was exculpatory. Alfred Jr.'s testimony that he heard his father get out of bed contradicts the Commonwealth's theory that Albrecht had started the fire by the time Alfred Jr. woke up. However, as the prosecutor argued in his closing, Alfred Jr. was "a son trying to hold onto his father. His mother is dead, and his sister's dead, and his [grandmother is] dead. [He] is trying to put his best foot forward and protect his father . . . ." Supp. App. 2888. In addition, as explained above, much of Alfred Jr.'s testimony actually was damaging.

In sum, Albrecht cannot exploit the new scientific knowledge here, assuming for the sake of argument that it is new, because of ample other evidence of guilt. He has not shown that he meets the Schlup gateway standard because we cannot conclude that, had the jury heard all the conflicting testimony, it is more likely than not that no reasonable juror viewing the record as a whole would lack reasonable doubt. Schlup, 513 U.S. at 327. It follows that neither has Albrecht met the heightened Herrera standard of proving actual innocence on a freestanding innocence claim. Thus, habeas relief is unavailable on the innocence claim.[10]

IV. Trial Counsel's Failure to Request a Limiting Instruction

---

[10] Because we conclude that not even the Schlup standard has been met, it necessarily follows that Albrecht's claim of innocence is insufficient to overcome Teague, even if we accept his argument, raised in the brief and at oral argument, that there is a fundamental miscarriage-of-justice exception to Teague, just as there is when a petitioner cannot show cause and prejudice for a defaulted claim.

26

Albrecht has argued that trial counsel was ineffective for failing to request a limiting instruction with respect to the evidence of spousal abuse. He argues that the Commonwealth's evidence of spousal abuse carried with it the possibility that the jury would use the evidence to conclude, improperly, that he had a bad character and a propensity to commit the crime. This claim was exhausted on direct appeal. Albrecht, 511 A.2d at 775–76.

Under Strickland v. Washington, 466 U.S. 668 (1984), a petitioner claiming ineffective assistance of counsel must demonstrate (1) that counsel's performance was deficient, that is, it fell below an objective standard of reasonableness, and (2) that counsel's deficient performance prejudiced his client. Id. at 689–92. In order to show prejudice, the petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

The state Supreme Court, applying its own precedent and commenting that its standard for determining ineffective assistance of counsel claims was the same as Strickland, held that there could be no ineffectiveness in not asking for a limiting instruction, because the evidence of prior misconduct was admissible to show motive, malice, and ill will. Albrecht, 511 A.2d at 775–76. When the deceased victim's spouse is the defendant, evidence of continual abuse is plainly admissible. Id. Specifically, the state Supreme Court determined that counsel's conduct was not substandard. Id. It did not reach the prejudice question.

The District Court concluded that counsel's conduct in not requesting a limiting instruction was deficient, and that the state court's decision to the contrary was not entitled to deference under section 2254(d)(1). The Court could not find any valid strategic reason for trial counsel to have chosen not to request a limiting instruction, because the evidence of abuse was not briefly or fleetingly presented, but instead was a substantial portion of the Commonwealth's case. The Court also emphasized that the Commonwealth's closing argument harped on "what type of man" Albrecht was. Once the Commonwealth did that, the danger of inadvertently highlighting the evidence, which might have presented a valid reason for not seeking a limiting instruction, had passed.

We agree with the District Court that the fact that evidence is admissible does not decide the question whether a limiting instruction should still have been requested by counsel, and that counsel's failure to seek a limiting instruction in Albrecht's case was substandard performance. Trial counsel is not constitutionally required to request a limiting instruction any time one could be given, because counsel might reasonably conclude that such an instruction might inadvertently call attention to the evidence of prior

27

bad acts.  See Buehl v. Vaughn, 166 F.3d 163, 170 (3d Cir. 1999).  In Albrecht's case, however, we do not believe that counsel might reasonably have concluded that it was strategically preferable to omit the request.  As the District Court explained, the evidence of spousal abuse was not briefly or fleetingly presented.

The Commonwealth's case against Albrecht was based on plentiful evidence that Mrs. Albrecht was a battered wife.  Evidence that a defendant has committed prior criminal acts is highly prejudicial.  See, e.g. Old Chief v. United States, 519 U.S. 172, 180–81 (1997).  Although the evidence was admitted for a legitimate purpose, that is, to show Albrecht's motive for deliberately starting the fatal fire, it carried with it the danger that the jury would use it for an improper purpose, that is, as evidence of Albrecht's bad character and criminal propensity.  Id. at 181.  The large quantum of evidence of spousal abuse at Albrecht's trial should have been a "red flag" for counsel.  Evidence of prior bad acts "is said to weigh too much with the jury and to so overpersuade them as to prejudge one with a bad general record and deny him a fair opportunity to defend against a particular charge."  Id. (quoting Michaelson v. United States, 335 U.S. 469, 475 (1948)).

The inflammatory nature of the evidence in Albrecht's case clearly did not exceed its evidentiary value so as to violate due process.  Lesko v. Owens, 881 F.2d 44, 52 (3d Cir. 1989).  Moreover, the trial judge appropriately limited the evidence of spouse abuse and infidelity to those acts that occurred within seven months of the fire.  See Albrecht, 511 A.2d at 771–72.  However, just as clearly, the jury should have been provided with a limiting instruction.  Where evidence of a defendant's prior bad acts is admitted, a defendant's interests are protected by a limiting instruction, which mitigates the possibility of prejudice.  Spencer v. Texas, 385 U.S. 554, 561–62 (1967).  The Pennsylvania Supreme Court has held that "it [is] extremely important that the jury understand in every case the limited purpose of such evidence."  Commw. v. Billa, 555 A.2d 835, 841 (Pa. 1989) (quoting Commw. v. Amos, 284 A.2d 748, 750 (Pa. 1971)).

In Albrecht's case, the need for a limiting instruction was not hypothetical.  In closing, the prosecutor improperly related the evidence of spousal abuse to Albrecht's character when he stated that: "If this man were capable of doing this for such a thing, carry it on to its logical conclusion, what type of man is Al Albrecht."  Supp. App. 2894.  In doing so, the prosecutor did not limit his use of the bad acts evidence to proving motive.  Instead, he explicitly called upon the jury, by asking "what type of man is Al Albrecht," to view the evidence of prior bad acts as evidence of Albrecht's bad character and propensity to commit this crime.

Strickland, however, requires more than just a showing of substandard performance.  A Sixth Amendment claim cannot be made out if Albrecht was not prejudiced by counsel's substandard conduct.  Prejudice is established when, but for

counsel's error, there was a reasonable probability that the outcome of the proceeding would have been different, and, thus, that confidence in the outcome is undermined. Id. at 694. In this case, the bad acts evidence was a central part of the Commonwealth's case. The jury was not cautioned against its use as propensity evidence, and, in fact, it was urged by the prosecutor during closing argument, without objection from defense counsel, to consider Albrecht's character and propensity for violence against his wife. This would be a potent combination of circumstances establishing prejudice if our confidence in the verdict was undermined, but it is not.

We have considered the prejudicial effect of the prosecutor's closing argument in conjunction with the lack of instruction. Even so, we agree with the District Court that the prejudice prong of Strickland cannot be satisfied.[11] We find this issue to be a very close one, but "[i]t is firmly established that a court must consider the strength of the evidence in deciding whether the Strickland prejudice prong has been satisfied." Buehl, 166 F.3d at 172. The ample if not overwhelming evidence of Albrecht's guilt, his attempt to purchase gasoline the day before the fire, the discovery of the hydraulic oil can which should not have tested positive for gasoline but did, and his numerous threats to a variety of people that he would kill his wife and/or burn down the house, supports the conclusion that he suffered no prejudice as a result of counsel's deficient performance in not seeking a limiting instruction.

Albrecht also raises a due process violation resulting from the trial court's failure to provide an appropriate limiting instruction on its own.[12] Habeas relief for a due process violation concerning an absent or defective jury instruction is available only when the absence of an instruction, or a defective instruction, infects the entire trial with unfairness. Cupp v. Naughton, 414 U.S. 141, 147 (1973). "It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court." Henderson v. Kibbe, 431 U.S. 145, 154 (1977). In Albrecht's case, the required objection was not made. In addition, an "omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law." Id. at 155. Albrecht does not argue that the trial court misstated the law by instructing, for example, that the jury could disregard the evidence and convict him on the basis of criminal propensity, or that

_____

[11] Because we find no prejudice and therefore agree with the state court that there was no Sixth Amendment violation, whether deference is owed to the state Supreme Court's determination that counsel's conduct was not deficient need not be decided.

[12] We were advised by counsel at oral argument that the due process claim was raised during post-conviction proceedings and is exhausted. It was not addressed by the state courts.

the prosecution need not prove guilt beyond a reasonable doubt. We are left then with the following well established evidence: Albrecht had a motive to kill Mrs. Albrecht, he was living at home and continuing to abuse her in violation of a court order, and he made numerous threats to harm her and burn down the house, and, as a result, we are not persuaded that the absence of a limiting instruction infected the entire trial with unfairness. See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995) (whether constitutional violation has occurred will depend upon evidence in case and overall instructions given to jury).

## V. The Brady Claim

During the habeas proceedings, the District Court granted Albrecht leave to pursue a Brady claim based on the late disclosure, or nondisclosure, of the statements of witnesses Allen Doelp, Thomas Jacob, Carol Frick, Elwood Steich, Valerie Cullingford, Jeffrey Doelp (Allen's son), and Nancy Mohr. Robert Goldman, Esquire, the prosecutor, testified at the evidentiary hearing as to what statements he actually, or likely, turned over at the time of trial. The testimony showed that Jeffrey Doelp and Nancy Mohr did not testify at trial, and his practice was nondisclosure with respect to non-testifying witnesses. The District Court ordered the Commonwealth to produce the statements of Jeffrey Doelp and Mohr. There was no real dispute that the statements of Allen Doelp, Carol Frick, Elwood Steich, and Valerie Cullingford all were disclosed, at a minimum, prior to their cross-examinations, again in keeping with the prosecutor's usual practices. The District Court also found that Thomas Jacob's statement had to have been turned over at the time of trial.

Once the District Court made findings about what had been turned over and what needed to be turned over, it concluded that Albrecht's Brady claim with respect to the statements of Allen Doelp, Jacob, Frick, Steich, and Cullingford was barred due to a procedural default. This claim was not raised at any level in state court, either on direct appeal or during post-conviction proceedings. Albrecht could not show cause for this failure, because these statements were available at the time of his direct appeal and state post-conviction case, and Albrecht could have pursued the claim at that time. With respect to the statements of Jeffrey Doelp and Mohr, the Brady claim, although unexhausted because it had not been pursued on direct appeal or in post-conviction proceedings, was not barred due to a procedural default. The District Court reasoned that Albrecht could show cause for his failure to bring this claim earlier because the Commonwealth had previously asserted that it had disclosed everything it was required to disclose.

With respect to the merits of the Brady claim that could be considered, the District Court rejected Albrecht's assertions that the undisclosed statements of Jeffrey Doelp and Mohr were material. Albrecht theorized that testimony at trial that he was less sooty was damaging because it implied that he was not in bed when the fire started. Jeffrey Doelp, Allen Doelp's son, gave a statement to police that Albrecht was all black from soot.

Nancy Mohr, an ambulance driver, gave a statement to police that both Albrecht and Alfred Jr. were all covered with soot. Albrecht contended that several of the Commonwealth's other witnesses testified inconsistently with their pretrial statements that he and Alfred Jr. were equally sooty.

The District Court disagreed that the undisclosed statements were material, reasoning that the presence or absence of soot was not a significant part of the Commonwealth's case. Moreover, it was undisputed that Albrecht escaped the fire prior to Alfred Jr. The jury could have determined that Alfred Jr. had a greater exposure to the rising black smoke over a longer period of time than did Albrecht, and, thus, his son necessarily would have had more soot on him, regardless of how the fire started.

We conclude that the Brady claim will not support habeas relief. There is no basis for disturbing the District Court's finding that Thomas Jacob's statement must have been disclosed at the time of trial, because we review the District Court's factual findings only for clear error. Whitney, 280 F.3d at 249. Albrecht's trial counsel's stipulation that he had no recollection of whether he received the statement is inadequate to show that the statement was not disclosed in accordance with the prosecutor's usual practices. The prosecutor's testimony at the evidentiary hearing credibly establishes that Jacob's statement was turned over.

Moreover, we agree with the District Court that the Brady claim concerning statements actually disclosed at the time of trial, or found to have been disclosed at the time of trial, is barred due to a procedural default. Albrecht's failure to raise this claim in state court constitutes a state procedural default that bars federal habeas review. Coleman, 501 U.S. at 729–30. The bar to review on the merits is lifted only upon a showing of cause for the state procedural default and actual prejudice resulting therefrom. Wainwright v. Sykes, 433 U.S. 72, 90 (1977). Albrecht cannot show cause for his failure to bring this claim on direct appeal or in his post-conviction case. In addition, there are no state remedies left for Albrecht to pursue, because a new state post-conviction petition raising this claim surely would be held to be untimely filed. See Commw. v. Banks, 726 A.2d 374 (Pa. 1999) (post-conviction petition time limits are jurisdictional and not subject to judicial relaxation). In certain exceptional cases involving a compelling claim of actual innocence, the procedural default rule is not a bar to habeas relief, Schlup, 513 U.S. at 319–322, but, as we have already explained, this is not such a case. Therefore, the statements of Allen Doelp, Thomas Jacob, Carol Frick, Valerie Cullingford, and Elwood Steich may not be considered on the merits.

With respect to the statements of Jeffrey Doelp and Nancy Mohr, we agree that no Brady violation occurred. To establish a violation of due process under Brady v. Maryland, 373 U.S. 83, Albrecht must show not only that the evidence was suppressed,

31

but also that it was material and favorable.  Id. at 87.  Evidence is material if there is "a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different."  United States v. Bagley, 473 U.S. 667, 682 (1985).  The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.  Kyles v. Whitley, 514 U.S. 419, 434 (1995).

The soot evidence from the statements of Jeffrey Doelp and Mohr was not material in the sense that its absence from the trial resulted in a verdict unworthy of confidence.  Kyles, 514 U.S. at 434.  Witnesses testified that Alfred Jr. was sooty in appearance following the fire.  This was consistent with his testimony that he just barely escaped death by jumping from a second story window.  The issue of the presence, or absence, of soot on Albrecht was discussed at trial by various witnesses.  One of the Commonwealth's own witnesses, Trooper Donald Lauriha, testified that Albrecht had soot all over his face and also on his arms.  However, Commonwealth witnesses Allen Doelp and Thomas Jacob did not testify consistently with their original statements that Albrecht was covered in soot.  Thomas Jacob, for example, gave a statement that Albrecht and Alfred Jr. were "black with soot," Supp. App. 3183, but he testified at trial that there was very little soot if any on Albrecht while Alfred Jr. was covered with soot.

Nevertheless, although Albrecht contends that testimony that he was not as sooty as Alfred Jr. was damaging, as explained by the District Court, there was an explanation for his having less soot on him that had nothing to do with how the fire started.  Alfred Jr.'s testimony was that Albrecht had exited the fire before him.  He looked out a second floor window, and saw his father run out the kitchen door.  He then saw his father run to his bedroom window.  Albrecht urged him to jump, but Alfred Jr. did not jump right away, and instead he crawled to his sister's bedroom to try to save her.  He saw that she was not in her room, and he could not check other bedrooms down the hall because there was too much smoke.  He then crawled back to his own window, which Albrecht was still standing under, and jumped.  In short, Alfred Jr. had a longer exposure to smoke, and thus would have had more soot on him even if Albrecht was still in bed when the fire started.

In arguing that the statements were material, Albrecht contends on appeal that his appearance following the fire was a significant part of the Commonwealth's case, and he notes that the state Supreme Court remarked on it, see Albrecht, 720 A.2d at 705, in addressing the prejudice prong of an ineffective assistance of counsel claim.  We see no error.  The prosecutor did not comment in his closing argument on the presence or absence of soot as evidence of guilt, and while it is true that in arguing its case on appeal the Commonwealth has made reference to the almost complete absence of soot on Albrecht himself, that argument is not evidence.

32

It is also true that the state Supreme Court remarked generally, without mentioning soot, on Albrecht's "appearance" following the fire in evaluating the evidence, Albrecht, 720 A.2d at 705, but the state court's determination that there was ample evidence of guilt did not rest to any great extent on Albrecht's appearance following the fire. It rested instead on the pattern of hostility and violence Albrecht exhibited toward his wife, his attempt to purchase gasoline the day before the fire, the discovery of the hydraulic oil can which should not have tested positive for gasoline but did, and his numerous threats to a variety of people that he would kill his wife and/or burn down the house. Id. Accordingly, we agree with the District Court that the trial resulted in a verdict worthy of confidence, Kyles, 514 U.S. at 434, notwithstanding the absence of more testimony that Albrecht too had soot on him.

It necessarily follows that this claim too is barred due to a procedural default. Even assuming that Albrecht could show cause for his failure to bring this Brady claim in state court earlier insofar as the claim arose during federal habeas proceedings, he cannot show prejudice, Wainwright, 433 U.S. at 90, because the claim lacks merit. "The analysis of prejudice for the procedural default of a Brady claim is identical to the analysis of materiality under Brady itself." Slutzker v. Johnson, 393 F.3d 373, 385 (3d Cir. 2004) (citing Strickler v. Greene, 527 U.S. 263, 282 (1999)). If the withheld evidence was not material to Albrecht's trial, then barring his federal habeas claim on procedural grounds would not create prejudice. Id. Moreover, Albrecht cannot show a miscarriage of justice sufficient to overcome the procedural bar, because he has not satisfied the gateway standard for doing so, see Schlup, 513 U.S. at 326–27, for the reasons already discussed.

Finally, in the context of his Brady claim, Albrecht has argued that trial counsel was ineffective for failing to present the favorable soot evidence from the statements of Thomas Jacob, Allen Doelp, Carol Frick, Valerie Cullingford, and Elwood Steich, and ineffective for failing to make enough use of the favorable soot evidence from Alfred Jr.'s statement. The District Court concluded in its January 10, 2003 order granting Albrecht an evidentiary hearing that these two ineffective assistance of counsel claims are unexhausted and subject to the same procedural default analysis that applies to the Brady claim concerning statements found to have been turned over at the time of trial. We agree that these ineffectiveness claims also are barred. See Coleman, 501 U.S. at 729–30.

VI. Mrs. Albrecht's Statements Concerning the Source of Her Injuries

Albrecht argues that admission of Mrs. Albrecht's hearsay statements to her attorney Mark Steinberg, physician Dr. George Young, friend Patricia Fullmer, and co-worker Sara Joraskie, concerning the source of her physical injuries, violated the Confrontation Clause, because none of these witnesses had any first-hand knowledge that Albrecht had caused the injuries they observed, and the statements did not have the

33

required particularized guarantees of trustworthiness. Albrecht does not contend that the statements at issue are testimonial under <u>Crawford v. Washington</u>, 541 U.S. 36 (2004), but rather that there is no "firmly rooted hearsay exception" applicable to them, and they lack any "particularized guarantees of trustworthiness," as required by <u>Ohio v. Roberts</u>, 448 U.S. 56, 66 (1980).

Steinberg testified that Mrs. Albrecht confided in him on two occasions that she had been abused and beaten by Albrecht. Dr. Young testified that Mrs. Albrecht consulted him on January 16, 1979 and told him "that her husband had punched, beat and kicked her the night before." Supp. App. 1720. Ms. Fullmer testified that Mrs. Albrecht told her that Albrecht had banged her head against the refrigerator and burned her face with a cigarette. Ms. Joraskie testified that the bruise she saw on Mrs. Albrecht's leg resulted from Albrecht kicking her.

The state courts did not decide a Confrontation Clause claim. A claim concerning the admissibility of evidence of the source of Mrs. Albrecht's physical injuries was decided under state law on direct appeal. <u>Albrecht</u>, 511 A.2d at 772.[13] The state Supreme Court also decided on direct appeal a claim that trial counsel was ineffective for failing to object to the admissibility, on hearsay grounds, of the testimony of Mrs. Albrecht's doctor

---

[13] In concluding that evidence of ill will is admissible to show motive, the state Supreme Court stated:

> [W]e note the existence of numerous instances of violent and hateful conduct between Appellant and his wife. Had there been only an isolated incident, that evidence would have been inadmissible. <u>Commonwealth v. Baker</u>, 466 Pa. 382, 353 A.2d 406 (1976). We are not confronted, however, with an isolated incident. Rather, the Commonwealth produced a chain of evidence illustrating Appellant's continual abuse of his wife. Several witnesses testified to marital problems Appellant and his wife experienced on the very night of the killings. Photographs illustrating the wife's battered condition, including cigarette burns on her face, were admitted into evidence after witnesses testified to her continuous gruesome appearance. Appellant not only admitted to slapping his wife occasionally, but that he was under court order to forego the physical abuse of his wife. The trial court ruling admitting evidence of Appellant's actions towards his wife for a period of seven months prior to the house burning was proper as it went to showing his ill-will and malice towards her, establishing his homicidal motive . . . .

<u>Id.</u>

34

and attorney.  Id. at 775–76.[14]  The Court concluded that Dr. Young's and attorney Steinberg's testimony was admissible for the purpose of showing a course of conduct, counsel had no basis for objecting to it, and thus his performance was not deficient.  Id.

A claim concerning the admissibility of the testimony of Ms. Fullmer and Ms. Joraskie was among those claims abandoned by replacement post-conviction counsel. Albrecht, 720 A.2d at 705.  The state Supreme Court considered it on appeal during post-conviction proceedings in the context of addressing whether replacement post-conviction counsel rendered ineffective assistance in abandoning it.  The Court concluded that Fullmer's and Joraskie's testimony was cumulative of other evidence offered at trial, and that Albrecht suffered no prejudice as a result of its having been admitted.  Id.

The District Court held that the statements unquestionably exhibited the required "particularized guarantees of trustworthiness."  The Court did not find it necessary to reach the question whether any firmly rooted hearsay exceptions applied.  Instead, the Court reasoned that numerous witnesses testified to the physical manifestations of abuse, including the bruising and cigarette burns.  Alfred Jr. testified that his father hit his mother on the night before the fire.  The police report from the night before the fire suggested a domestic disturbance, and the Protection From Abuse order represented a judicial finding of spousal abuse.  Furthermore, Albrecht's admissions guaranteed trustworthiness.  The court observed that Albrecht's suggestion that Mrs. Albrecht was falsely complaining of abuse "strain[ed] credulity."  If admission of the statements concerning the source of Mrs. Albrecht's injuries did violate the Confrontation Clause, the error was harmless.

We will address the merits of the claim.[15]  Crawford changed the legal landscape for determining whether the admission of testimonial hearsay statements violated the accused's rights under the Confrontation Clause.  In Crawford, the Supreme Court, partially abrogating Roberts, rejected the argument that, so long as the testimonial hearsay was subject to an exception or bore "indicia of reliability," the Confrontation Clause was not violated, saying that it "'commands, not that evidence be reliable, but that reliability be assessed in a particular manner: by testing in the crucible of cross-examination.'" United States v. Gonzalez-Lopez, 547 U.S. __, 126 S. Ct. 2557, 2562 (2006) (quoting Crawford,

---

[14]  Albrecht sought to raise the claim again on appeal to the state Supreme Court during post-conviction proceedings, but the Court declined to revisit it.  Albrecht, 720 A.2d at 705.

[15] The Commonwealth has addressed the issue in its brief on appeal on the merits and does not argue that it is unexhausted, and we conclude that it does not warrant habeas relief.

541 U.S. at 61).

Albrecht does not contend that the statements at issue here are testimonial. Thus, we do not consider the admissibility of the statements under Crawford. As to nontestimonial statements, the Confrontation Clause does not preclude their admission if they are subject to a firmly rooted hearsay exception or bear an adequate indicia of reliability. United States v. Hendricks, 395 F.3d 173, 179 (3d Cir. 2005) (addressing Roberts). Unless and until the Supreme Court holds otherwise, Roberts still controls nontestimonial statements. Id.

We agree with the District Court's ultimate conclusion that the statements bore the necessary indicia of reliability. The "particularized guarantees of trustworthiness," Roberts, 448 U.S. at 66, "must be shown from the totality of the circumstances, but . . . the relevant circumstances include only those that surround the making of the statement and that render the declarant particularly worthy of belief," Idaho v. Wright, 497 U.S. 805, 819 (1990). "In other words, if the declarant's truthfulness is so clear from the surrounding circumstances that the test of cross-examination would be of marginal utility, then the hearsay rule does not bar admission of the statement at trial." Id. at 820. See also Lee v. Illinois, 476 U.S. 530, 544 (1986) (determining reliability from circumstances surrounding making of statement).

We have "considerable leeway" in making the determination, Wright, 497 U.S. at 822, so long as the factors we use relate to whether the declarant was particularly likely to be telling the truth when the statement was made. We conclude that Mrs. Albrecht was worthy of belief on the issue of the identification of her husband as the source of her injuries. Wright, 497 U.S. at 819. She identified Albrecht in the course of seeking medical care, cf. Fed. R. Evid. 803(4), and legal assistance in the form of a restraining order, which meant that her statement to her attorney would have to be verified in a court of law. Her statements to Ms. Fullmer and Ms. Joraskie present a closer question, but the state Supreme Court determined that their testimony was cumulative and thus prejudice could not be shown. Even if we conclude that there was a Confrontation Clause error, we must defer to this harmless error holding because it was not in "conflict with the reasoning or holdings of [Supreme Court] precedent" and the court did not "appl[y] harmless-error review in an 'objectively unreasonable' manner." Mitchell v. Esparza, 540 U.S. 12, 17–18 (2003) (applying 28 U.S.C. § 2254(d)(1) to harmless error analysis).

Albrecht also argues that appellate counsel was ineffective for failing to contend on direct appeal that the Kuhns' recollection of Alfred Jr.'s statement was inadmissible hearsay. Carol and Terry Kuhns, neighbors, testified that Alfred Jr. appeared at their door the night before the fire and said that his father was hitting his mother again and threatening to burn down the house. Alfred Jr. testified that what he really said was that

his father was hitting his mother again and threatening to burn her dress. The ineffective assistance of appellate counsel claim concerning Carol Kuhns' testimony was among those claims abandoned by replacement post-conviction counsel, and addressed by the state Supreme Court in the context of ineffective assistance of replacement post-conviction counsel. Albrecht, 720 A.2d at 704.

The state Supreme Court concluded that the trial court had erred in admitting this hearsay statement as an excited utterance over counsel's objection, id. (citing Pa. R. Evid. 803(2)), but Albrecht was not prejudiced by replacement post-conviction counsel's conduct in abandoning the issue, and thus the appellate counsel ineffectiveness claim was waived. Id. at 705. The Court reasoned that there was considerable other testimony of threats to burn down the house, and Alfred Jr. testified, corroborating the statement to the extent of the threats and refuting it to the extent of what exactly his father had threatened to burn. Moreover, Alfred Jr.'s version of his statement, and not the Kuhns' version, was corroborated by Officer Heckenswiler. Id.

Thus, as with the Mills claim, there was a state procedural default with respect to this ineffective assistance of appellate counsel claim insofar as it was abandoned at the trial court level, O'Sullivan, 526 U.S. at 844–45, and the state supreme court held that it was waived. However, the claim is not barred due to a procedural default, because the new waiver rule applied for the first time in Albrecht, 720 A.2d 693, is not independent and adequate as to Albrecht, Doctor, 96 F.3d at 683–84. Like the Mills claim, the doctrine of procedural default does not bar consideration of this claim.

The District Court assumed that appellate counsel's performance was deficient, but concluded that Albrecht had failed to prove prejudice. Alfred Jr. denied making the statement, and, even if the jury credited the Kuhns' testimony, there was ample other evidence on which to base the conviction. We conclude that deference is owed to the state court's prejudice analysis, 28 U.S.C. § 2254(d)(1), because it is not contrary to, nor an unreasonable application of, federal law. The state Supreme Court identified Sixth Amendment standards, Albrecht, 720 A.2d at 701 n.8, and then purported to apply them. Cf. Priester, 382 F.3d at 398.

The state Supreme Court's conclusion that appellate counsel's conduct in not raising this issue on direct appeal did not prejudice Albrecht is not objectively unreasonable. Williams, 529 U.S. at 410. There was ample other testimony of threats to burn down the house, and the Court wisely noted that, when Alfred Jr. testified, he refuted the statement to the extent of what exactly Albrecht had threatened to burn, and his testimony concerning what he really said to the Kuhns was corroborated by Officer Heckenswiler. Albrecht, 720 A.2d at 705. Thus the jury was unlikely to credit the Kuhns' testimony over Alfred Jr.'s on the sole point of what Albrecht had threatened to burn.

37

## VII. Ineffective Assistance of Appellate Counsel

Albrecht next contends that appellate counsel rendered constitutionally defective assistance in failing to challenge on direct appeal the trial court's ban on attorney-client contact before and during cross-examination. According to Albrecht, the ban on attorney consultation was a clear violation of state constitutional law, constitutes reversible error, and does not require a showing of prejudice. See Commw. v. Werner, 214 A.2d 276, 277 (Pa. Super. Ct. 1965); Commw. v. Vivian, 231 A.2d 301, 304 (Pa. 1967); Commw. v. Logan, 325 A.2d 313 (Pa. 1974).

Albrecht testified in his own defense, beginning on August 4, 1980. At the end of the day, and before direct examination had concluded, the trial court adjourned and declared a recess until 9:30 a.m. the following day. The prosecutor asked the court to instruct Albrecht not to discuss past and future testimony. Trial counsel began to object, "Your Honor, I think he cannot —," when the trial court interrupted, stating, "That is improper instruction. While he is on direct examination that is all right. While on direct examination he has the right to confer with his counsel." Supp. App. 2493.

Albrecht resumed his testimony on August 5. The trial court declared a recess in the morning just prior to cross-examination, which the parties appear to agree was about fifteen minutes, and instructed Albrecht not to talk with his attorney. Trial counsel did not object. During cross-examination, another recess was declared for lunch, which Albrecht asserts lasted about two hours. The trial court reminded Albrecht that he was not speak to "anyone" during the lunch break. Again trial counsel did not object.

An ineffective assistance of trial and appellate counsel claim concerning the ban on attorney-client communication was raised for the first time on appeal to the state Supreme Court during post-conviction proceedings, and not raised at all in the pro se or amended post-conviction petitions. Albrecht, 720 A.2d at 703–04. Thus, the claim is unexhausted because it was not presented to the trial court. O'Sullivan, 526 U.S. at 844–45. The state Supreme Court held that the claim was waived, and because ineffective assistance of post-conviction counsel was not alleged, the Court did not do a prejudice analysis. Albrecht, 720 A.2d at 704. Accordingly, like the Mills claim, this claim is not barred due to a procedural default, because the waiver rule applied for the first time in Albrecht, 720 A.2d 693, is not independent and adequate as to Albrecht, Doctor, 96 F.3d at 683–84. Unlike the Mills claim, no deference is owed under 28 U.S.C. § 2254(d)(1), because the state Supreme Court did not do a prejudice analysis.

The District Court addressed a claim of trial counsel ineffectiveness. Noting that the failure to object on state law grounds may form the basis of a Sixth Amendment ineffective assistance of counsel claim, see Carpenter v. Vaughn, 296 F.3d 138, 159 (3d

Cir. 2002), the District Court observed that, for many years, the state Supreme Court had held that no limitation on consultation was permissible.  Vivian, 231 A.2d at 304 (no justification for imposing restriction of silence between accused and counsel during trial recess); Commw. v. Barber, 378 A.2d 1011, 1012–13 (Pa. Super. Ct. 1977).  In fact, the state Supreme Court never officially overruled those decisions.

However, Vivian, 231 A.2d 301, based the absolute right to consultation on an interpretation of federal constitutional law.  In Geders v. United States, 425 U.S. 80 (1976), the United States Supreme Court held that a defendant cannot be precluded from consulting with counsel during an overnight recess.  That interpretation was called into doubt in Perry v. Leeke, 488 U.S. 272 (1989), where the Supreme Court held that "in a short recess in which it is appropriate to presume that nothing but the testimony will be discussed, the testifying defendant does not have a constitutional right to advice."  488 U.S. at 284.  The recess at issue in Perry was fifteen  minutes in length, as was the recess in Albrecht's case that was taken just before cross-examination began.  With respect to the two-hour recess that occurred during cross-examination, the District Court concluded that it was more akin to the recess in Perry than the overnight recess in Geders.  The Court believed that the only topics of discussion would be either the testimony itself or issues which bore directly on it.  Accordingly, Albrecht's right to consultation was not abridged, and trial counsel was not ineffective in failing to raise an objection.

Ineffective assistance of appellate counsel is judged by the Strickland standard.  United States v. Mannino, 212 F.3d 835, 840 n.4 (3d Cir. 2000).  To establish that appellate counsel was ineffective, Albrecht must show that counsel's representation fell below an objective standard of reasonableness.  Strickland, 466 U.S. at 687–88.  We judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.  Id. at 690.  We are not persuaded that the issue had clear merit under Pennsylvania law.  We point out as an initial matter that the issue of the ban on attorney-client contact was before the state Supreme Court in Albrecht's case during post-conviction proceedings, and the Court declined to reach it on the merits.

In any event, appellate counsel might reasonably have concluded, as did the District Court, that Pennsylvania courts would likely overrule their prior decisions and apply the United States Supreme Court's analysis from Perry if the issue were presented to them.  In Perry, the Supreme Court reasoned that the truth-seeking function of cross-examination might be impeded by consultation prior to cross-examination, id. at 282, and thus it did not disapprove of the fifteen minute prohibition occurring just before the commencement of cross-examination.  "[C]ross examination of a witness who is uncounseled between direct-examination and cross-examination is more likely to lead to the discovery of truth than is cross-examination of a witness who is given time to pause and consult with his attorney."  Id.  As explained by the District Court, the fifteen minute prohibition on consultation just

prior to cross-examination is permitted by <u>Perry</u>. In addition, the two-hour prohibition over lunch time, which occurred in the middle of cross-examination, likely is tolerable under <u>Perry</u> insofar as the sole topic of discussion would have been the testimony itself.

Furthermore, <u>Commonwealth v. Scoleri</u>, 248 A.2d 295, 296–98 (Pa. 1969), might have given appellate counsel pause, because Albrecht's trial counsel did not object to the restrictions imposed on August 5. In <u>Scoleri</u>, the state Supreme Court found that the trial court erred in instructing the defendant not to confer with counsel during a noontime recess following an adjournment occurring during direct examination. <u>Id.</u> at 575–76. However, the Court held that the issue was waived on appeal because trial counsel failed to object. <u>Id.</u> at 578–79. Like the attorney in <u>Scoleri</u>, Albrecht's trial counsel did not make a request for consultation on August 5 and did not raise an objection.[16]

Finally, appellate counsel argued numerous guilt-phase issues on direct appeal, including that the search of Albrecht's vehicle and confiscation of the gas can were illegal, <u>Albrecht</u>, 511 A.2d at 768–69, that the trial court erred when jurors were excluded for cause because they expressed a conscientious objection to the death penalty, <u>id.</u> at 769, that Albrecht was denied his right under the United States and Pennsylvania Constitutions to a jury comprised of a fair cross-section of the community, <u>id.</u> at 770, that the trial court erred in admitting evidence regarding his prior misconduct toward his wife, <u>id.</u> at 771–72, and that the trial court erred in failing to require sequestration of an expert witness, <u>id.</u> at 772. In addition, appellate counsel raised seven ineffective assistance of trial counsel claims, including that trial counsel was ineffective for failing to seek a limiting instruction concerning the prior bad acts evidence. <u>Id.</u> at 775. He also raised numerous sentencing phase issues. <u>Id.</u> at 773–75. In view of the number and seriousness of the issues appellate counsel chose to pursue on direct appeal, trial counsel's failure to object to the consultation ban, and the probable lack of merit to this claim under federal constitutional law, we conclude that there was a reasonable and strategic basis for appellate counsel not to have raised the issue of the consultation ban on direct appeal. <u>Mannino</u>, 212 F.3d at 844.

## VIII. Cumulative Prejudice

---

[16] Certiorari was granted in <u>Scoleri v. Pennsylvania</u>, 408 U.S. 934 (1972), and the death sentence was vacated and the case remanded for further proceedings consistent with <u>Furman v. Georgia</u>, 408 U.S. 238 (1972). <u>Scoleri's</u> reasoning continued to be influential, however. In <u>Barber</u>, 378 A.2d 1011, the Pennsylvania Superior Court discussed and distinguished <u>Scoleri</u> in holding that a restriction on the scope of counsel's consultation with a defendant during a ten minute recess following direct examination was reversible error. <u>Id.</u> at 1013.

Last, Albrecht contends that, if none of the errors individually are sufficiently prejudicial to require relief, the cumulative prejudice resulting from them undermined the fundamental fairness of his trial and denied him his constitutional right to due process. The District Court rejected the claim of cumulative prejudice. The Court reasoned that Albrecht had a motive to kill. In addition, he was living at home and continuing to abuse Mrs. Albrecht in violation of a court order. There was significant physical evidence against him, including his attempt to purchase gasoline the day before the fire and the discovery of the hydraulic oil can which should not have tested positive for gasoline but did. Finally, he made numerous threats to a variety of people that he would kill his wife and/or burn down the house. Thus, even though the trial was not error-free, the verdict was not unreliable.

We recognize that errors that individually do not warrant habeas relief may do so when combined. Marshall v. Hendricks, 307 F.3d 36, 94 (3d Cir. 2002).[17] Here we consider the guilt-phase errors we have identified, id. at 94 n.43, including that trial counsel erred in not seeking a limiting instruction with respect to evidence of spousal abuse and the prosecutor improperly argued during closing that Albrecht had a propensity to commit these crimes. We consider that the Commonwealth's evidence of an incendiary origin was contested at trial, and that Trooper York's scientific reasoning, if not his conclusion, has been discredited.

The standard for evaluating harmless error on collateral review is set forth in Brecht v. Abrahamson, 507 U.S. 619 (1993). This is the standard applicable here, because "a cumulative-error analysis merely aggregates all the errors that individually have been found to be harmless, and therefore not reversible, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." Darks v. Mullin, 327 F.3d 1001, 1018 (10th Cir. 2003). Cumulative errors are not harmless if they had a substantial and injurious effect or influence in determining the jury's verdict, which means that a habeas petitioner is not entitled to relief based on cumulative errors unless he can establish "actual prejudice." Brecht, 507 U.S. at 637. See Whitney, 280 F.3d at 258–59 & n.18 (Strickland prejudice and Brecht harmless error are essentially same standard).

Once again, however, we agree with the District Court that Albrecht has not shown that the cumulative prejudice resulting from the errors we have identified undermined the reliability of the verdict. Albrecht had a motive, he continued to abuse Mrs. Albrecht in

---

[17] The state courts did not address a claim of cumulative prejudice flowing from the errors we have identified, and thus no deference is owed under 28 U.S.C. § 2254(d)(1).

41

violation of a court order, there was physical evidence against him, and he made numerous serious threats to a variety of people that he would kill his wife and/or burn down the house. Thus, the verdict was not unreliable.

## IX. Conclusion

For the reasons stated, the judgment of the District Court entered on April 21, 2004 will be vacated to the extent that the writ was granted on the <u>Mills</u> issue. The matter will be remanded to the District Court. On remand, the District Court should apply <u>Teague</u> in conjunction with <u>Beard</u> and deny relief on the <u>Mills</u> claim. The Court should consider the remaining sentencing-phase issues, which it initially denied as moot. The Court's determination that the guilt-phase issues do not warrant habeas relief will be affirmed.